Jonathan Mark Levitan (BAR NO. 106798)
LAW OFFICES OF JONATHAN MARK LEVITAN
12400 Wilshire Boulevard, Suite 1300
Los Angeles, California 90025
Telephone Number: 310.979.9240
Facsimile Number: 310.494-0068
E-mail: jonathanlevitan@aol.com

LINCOLN D. BANDLOW (SBN 170449)
lbandlow@lathropgage.com
LATHROP & GAGE LLP
1888 Century Park East, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 789-4600
Fax: (310) 789-4601

Attorneys for Plaintiff Private Chefs, Inc

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Private Chefs, Inc<br><br>    Plaintiff,<br><br>vs.<br><br>Food Network, Inc., a business entity type unknown, Scripps Networks, LLC, a Delaware Limited Liability Company, Scripps Network Interactive Inc., a business entity, type unknown, Target Entertainment Group,<br><br>    Defendants. | CASE NO. CV 106159 CBM (Ssx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION** |

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

*Plaintiff seeks this extraordinary and ex-parte relief because plaintiff does not have sufficient time to seek this relief through the noticed motion process. The next and second season of the televisions show, Private Chefs of Beverly Hills, is scheduled to air for the first time on October 12, 2010 (Declaration of Paier, para. 29, and Exhibit 12 to the Paier declaration). This simply does not allow plaintiff to enjoin the broadcast of that, and subsequent episodes, other than through the ex-parte process.*

Plaintiff, Private Chefs, Inc., ("Plaintiff") which has its principal office in Beverly Hills, pitched a detailed proposal for a television program that involved having chefs, who worked for celebrities and wealthy persons, explaining recipes and the details of how the food was cooked and served, often doing so along side the celebrities for whom they cooked. Defendants The Food Network ("Food Network"), Scripps Network Interactive ("Scripps") and Target Entertainment Group, Inc. ("Target Entertainment") (collectively "Defendants") stole that idea to create a show that began running on The Food Network this past April. Defendants compounded their theft by hijacking Plaintiff's goodwill by branding this purloined show with Plaintiff's trademark, calling the show "Private Chefs of Beverly Hills" (the "Show").

As set forth below, Defendant's knowing and intentional use of Plaintiff's federally registered mark "Private Chefs" in the title for the Show has already caused, and likely will continue to cause, tremendous consumer confusion as to the source, origin or affiliation of the Show with Plaintiff and its business, particularly in light of the fact that Plaintiff's main office is in Beverly Hills and, thus, Plaintiff

2

is known as *the* "Private Chefs of Beverly Hills." Accordingly, Plaintiff is entitled to an the relief sought prohibiting Defendants from using Plaintiff's trademark in connection with the Show.

## II. FACTUAL BACKGROUND

Plaintiff Private Chefs, Inc was formed in 1995. *See* Declaration of Christian Paier ("Paier Decl.") ¶ 1. It places private chefs in the homes of various celebrities and persons of substantial wealth. *Id.* at ¶ 2. Currently, Plaintiff represents about 2,000 private chefs and has placed these chefs in homes throughout the world. *Id.* Plaintiff's principal office is in Beverly Hills, California, and it also has offices in New York, London, Palm Beach, San Francisco, Washington DC, Dallas and Las Vegas. *Id.* Plaintiff is the leading private chef placement agency in the world. *Id.* Its reputation for provided elite chef services is unmatched and is a result of many years of providing the quality services that its demanding clients pay for and expect. *Id.*

Since 1995, Plaintiff has continuously used the mark "Private Chefs" (the "Mark") in interstate commerce to identify its services, products, and online information in the field of culinary arts. *Id.* at ¶¶ 4-12. Plaintiff has used the Mark to distinguish its products from those made and sold by others, and among other things, has prominently displayed the Mark on all of its publications. In addition, Plaintiff has prominently displayed this Mark on websites, invoices and advertisements distributed throughout the United States and the world. *Id.*

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

On May 9, 2005, Plaintiff filed in the United States Patent and Trademark Office ("USPTO") an application for registration of the Mark. *Id.* at ¶ 7. On December 5, 2006, the USPTO registered the mark under Registration number 3,179,551 on the Principal Register. *Id.* The registration is valid and has never been cancelled. *Id.* at ¶ 8.

In 1997, Plaintiff purchased the domain name www.privatechefsinc.com and launched the www.privatechefsinc.com website. *Id.* at ¶ 11. Plaintiff has invested substantial time, effort and financial resources promoting its Mark in connection with the marketing and sale of its goods and services in interstate commerce. *Id.* at ¶ 12. The Mark has become an asset of substantial value as a symbol of Plaintiff and its business, the quality of its goods and services and its goodwill. *Id.*

On April 2, 2002, Plaintiff's President, Christian Paier, together with a representative from Strand Communications ("Strand"), attended a meeting at the Food Network in New York City. *Id.* at ¶ 14. Plaintiff and Strand had requested the meeting to pitch an idea for a television show, tentatively called "Celebrity Dish." The pitch was premised on a weekly show where chefs who worked for celebrities and substantially wealthy persons would appear on the show to explain recipes and how food was cooked and served. *Id.* Included in the pitch was the concept that the celebrities for whom these chefs worked would sometimes appear on the show with the chefs. Crucially, the pitch included a filmed presentation of the proposed show and the details about the proposed show. *Id.*

After taking this pitch and keeping a copy of the filmed presentation, Food Network informed Plaintiff that it was supposedly not interested in purchasing the show. *Id.* at ¶ 15. In April of 2010, however, Defendants[1] began broadcasting a television show on the Food Network that is, for all intents and purposes, the exact same show that Plaintiff pitched to Food Network in 2002. *Id.* Shockingly, not only were the contents for this show taken right from Plaintiff's pitch and materials, but Defendants had specifically incorporated Plaintiff's federally registered trademark by titling the show "Private Chefs of Beverly Hills."

Thus, Defendants have used and will continue to use Plaintiff's Mark in interstate commerce by various acts, including producing and airing a television show entitled "Private Chefs of Beverly Hills," and by displaying the Mark on television, websites (Food Network.com) and other media web sites. Moreover, Defendants have offered for sale and advertised such television show and related items under the name "Private Chefs of Beverly Hills." Based on publicity put out by Defendants, the next season of episodes of the Show is currently in production and it appears that the first episode of the second season of the series will air on the Food Network starting in October 2010. *Id.* at ¶ 36.

Defendants' use of the "Private Chefs" trademark is without the permission or authority of Plaintiff. *Id.* at ¶ 41. Not only is such a use likely to cause confusion, mistake and to deceive the consumer public – it has actually done so. Indeed, as set forth in the concurrently-filed Declarations of Christian Paier, Gregg Dawson, Michael Buechi, Adrienne de Winter, Michael Montilla, Michael

---

[1] Target Entertainment Group is the company which produces the Show, Scripps Interactive is the owner of the Food Network and Scripps Networks is owned by Scripps Networks LLC, a company listed on the New York Stock Exchange (SNI). *Id.* at ¶ 16.

5

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE
PRELIMINARY INJUNCTION

Bongiorno, Nicolas Roland, Jerry Masi, Paola Petrella, and Mary M. Zukowski, the Show's theft of Plaintiff's federally registered trademark has cause substantial actual consumer confusion. Thus, Plaintiff routinely encounters instances of actual confusion where consumers associate Defendant's Show with Plaintiff.

On July 16, 2010, Plaintiff notified Defendants of their infringement of Plaintiff's Mark and requested that Defendants cease and desist from their unauthorized use of the "Private Chefs" mark. Defendants responded in writing through their counsel and refused to address Plaintiff's concerns and threatened sanctions. (See, Exhibit 1 to Declaration of Jonathan Levitan.) Accordingly, Plaintiff was compelled to bring this *ex parte* application to request that the Court order that Defendants do what they should have voluntarily done on their own: stop deceiving the public by using Plaintiff's "Private Chefs" trademark to monikor Defendants' stolen Show.

## II. PLAINTIFF IS ENTITLED TO A TRO/PRELIMINARY INJUNCTION

A party seeking a TRO/Preliminary Injunction must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v National Resources Defense Council*, (2008) 129 S.Ct. 365; *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 (9th Cir. 1989) (affirming preliminary injunction under Lanham Act § 43(a)). Here, all of these factors favor the grant of a temporary restraining order and order to show cause.

### A. Plaintiff Is Likely To Succeed On The Merits Of Its Trademark Infringement Claim

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

The Lanham Act prohibits the "use[] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a)(I)(A). In a trademark case, likelihood of confusion is the touchstone. In the typical case, the first user of a mark (the senior user), sues a later user of a confusingly similar mark (the junior user), alleging that the junior user is attempting to capitalize on the confusion created by the marks to take a free ride on the senior mark's goodwill. In a "reverse confusion" case, the senior mark seeks to "protect its business identity from being overwhelmed by a larger junior user who has saturated the market with publicity." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002).

Registration of a mark on the Principal Register in the USPTO constitutes *prima facie* evidence of the validity of the registered mark and of the trademark owner's exclusive right to the mark on the goods and services specified in the registration. *See Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999). Because the Mark is registered on the Principal Register, the only remaining issue is whether "Private Chefs of Beverly Hills" is similar enough to the "Private Chefs" Mark to cause confusion, or to cause mistake or to deceive. Thus, the question is whether consumers are likely to mistakenly believe that the Show is "somehow affiliated with or sponsored by" Plaintiff. *Cohn*, 281 F.3d at 841; *Dreamworks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998) (the question is "whether consumers doing business with the senior user might mistakenly believe they are dealing with the

7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE
PRELIMINARY INJUNCTION

junior user").

In answering this question, courts take guidance from the eight Sleekcraft factors, first articulated in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). They are:

(1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound, and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion.

The factors are intended as guideposts only, and the weight to be afforded to each depends on the circumstances of the case. *See Id.* ("The factors should not be rigidly weighed, we do not count beans"); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005) ("The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them"); *Fortune Dynamics, Inc. v. Victoria's Secret Stores Brand Mgmt.*, --- F.3d ---, 2010 WL 3258703, *2 (9th Cir. Aug. 19, 2010) (*Sleekcraft* factors are not "a scorecard, a bean-counter, or a checklist" and are "best understood as simply providing helpful guideposts").

A consideration of each of the *Sleekcraft* factors leads to the inevitable conclusion that consumers are likely to be confused by Defendants' use of Plaintiff's Mark in Defendants' Show.

1.

**Strength Of The Mark**

In a reverse confusion case, the Court focuses on the strength of the junior mark, although the strength of the senior mark is relevant as well. *Surfvivor*, 406

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

F.3d at 631 n.3. The inherent strength of a mark is measured along the following spectrum: Arbitrary and fanciful marks are the strongest, suggestive marks fall in the middle, descriptive marks are presumptively weak, and generic marks are not entitled to trademark protection at all. *Id.* at 631-32. A mark is arbitrary if it uses known words that have no connection to the product (*e.g.*, "Old Navy" for a clothing store). *Id.* It is fanciful if it consists of a "coined" word or phrase that is not inherently evocative of the product (*e.g.*, "iPod" for a portable music player). *Id.* at 632. Suggestive marks do not describe the product, but suggest its features, requiring some degree of imagination to make the suggestive leap (*e.g.*, "Greyhound" for a bus service). *Id.* Descriptive marks merely describe a feature of the product without engaging the imagination (*e.g.*, "flame broiled" for hamburgers). *Id.* The final category of marks consists of "generic" marks, which describe the product in its entirety, and which are not entitled to trademark protection - for example, "multi-state Bar Examination." *Id.*

   In the world of providing chef services to the wealthy and famous, Plaintiff *is* the business and is dominant in its field. *See* Paier Decl. at ¶¶ 3 and 20. In determining the strength of a trademark, its "commercial strength" is as relevant as its inherent strength. *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). Moreover, the Mark is suggestive, as the USPTO has already determined by placing the mark on the Principal Register. The Mark alludes to a quality or characteristic of the service, such as providing carefully selective chefs to an exclusive clientele. In addition, the Mark alludes to the nature, characteristic and *quality* of the chefs themselves. Plaintiff carefully screens the chefs it accepts into its roster and routinely rejects chefs that are deemed, to Plaintiff, to be inappropriate to its roster or to its clientele. *Id.* at ¶ 3.

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

The greater the power of the mark in the marketplace, the more likely consumers in the marketplace will be confused. *See Survivor Media, Inc.* 406 F.3d at 632. The Mark is a strong mark deserving protection, and has become powerful in the marketplace. Since consumers are likely to be confused when encountering the well known mark, the "strength of the mark" *Sleekcraft* factor favors Plaintiff.

There is no question that The Food Network's power to market the Show through the inherently overwhelming nature of television runs the risk of overwhelming the Mark and its ability to uniquely identify Plaintiff and its goods and services. It is highly likely that The Food Network's junior mark will "overwhelm any public recognition and goodwill that [Private Chefs] has developed in the mark." *Cohn*, 281 F.3d at 841. There is substantial danger that The Food Channels ability to saturate the marketplace will lead consumers to assume that the Show is somehow associated with Plaintiff and its Mark. *Id.* at 842.

2.

**Proximity Or Relatedness Of The Goods**

Here, there is tremendous proximity – Defendants broadcast their Show in the exact markets where Plaintiff operates its business and provides its services. Moreover, the similarity in the services of both parties could not be more exact. The relationship between the television show "Private Chefs of Beverly Hills" and "Private Chefs" could not be closer. *Brookfield*, 174 F.3d at 1047, 1056 (9th Cir. 1999). The focus is on whether the consuming public is likely somehow to associate one company's products with the other. *Id.* The consuming public views the goods at issue here as associated. Actual confusion is occurring everyday with regards to the origin of these two products. See concurrently-filed Declarations of

10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

Christian Paier, Gregg Dawson, Michael Buechi, Adrienne de Winter, Michael Montilla, Michael Bongiorno, Nicolas Roland, Jerry Masi, Paola Petrella, Kenneth J. Lammer, and Mary M. Zukowski. The services are highly related because they are identical and the consuming public believes them to be related.

The more closely related the goods are, the more likely that consumers will be confused by similar marks. *Thane Int'l, Inc.*, 305 F.3d at 903. The danger presented by related goods is that the public will mistakenly assume there is association between the producers of the related goods, though no such association exists. *AMF Inc.*, 599 F.2d at 350. The contents of Defendants' Show relates precisely to the exact same services that are provided by Plaintiff.

### 3.   Similarity of Sight, Sound and Meaning

In determining whether marks are similar enough to confuse consumers, the court must consider their sight, sound and meaning as they appear in the marketplace. *Goto.com*, 202 F.3d at 1206. "Private Chefs" and "Private Chefs of Beverly Hills" are aurally indistinguishable. Visually, "Private Chefs of Beverly Hills" employs the sign of the City of Beverly Hills, the same distinctive sign featured by Private Chefs in its advertising. *See* Paier Decl. at ¶ 23 and Exhibits thereat.

### 4.   Evidence of Actual Confusion

"The best evidence of likelihood of confusion is provided by evidence of actual confusion." *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 506 (5th Cir. 1980); *see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987) ("[e]vidence of actual confusion is persuasive proof that future confusion is likely"). There is already an

11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

overwhelming amount of evidence showing actual confusion among consumers. The court is referred to the contemporaneously filed declarations of Gregg Dawson, Michael Buechi, Adrienne de Winter, Michael Montilla, Michael Bongiorno, Nicolas Roland, Jerry Masi, Paola Petrella, Kenneth J. Lammer, and Mary M. Zukowski. It is well-established that if enough people have been actually confused, likelihood that consumers will be confused is established. *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).

### 5. Marketing Channels

Both Plaintiff and Defendants market their services through the same channels: the internet. Indeed, when one searches "Private Chefs of Beverly Hills" on Google, it comes back with websites relating to the Show before listing Plaintiff's website. It is well-established that "the use of the Web [by both plaintiff and defendant as a marketing channel] is a factor 'that courts have consistently recognized as exacerbating the likelihood of confusion.'" *Go.to.com*, 202 F.3d at 1207 (*quoting Brookfield*, 174 F.3d at 1057)).

### 6. Intent

"When one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived." *AMPAS v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991). This presumption of deception is sufficient to support entry of a TRO/Preliminary Injunction. *St. Ives Lab. v. Nature's Own Lab.*, 529 F. Supp. 347, 349-50 (C.D. Cal. 1981) (preliminary injunction entered where "the Defendant has deliberately chosen a packaging and trade dress nearly identical to Plaintiff's, [and] likelihood of confusion is [therefore] presumed"); *see also*

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

*Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1283 (C.D. Cal. 1997) (preliminary injunction entered because "when an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public").

There can be no question that Defendants intentionally utilized Plaintiff's "Private Chefs" mark. As of 2002, the date of the meeting in New York, defendant Food Network knew of the existence of the Mark. Paier Decl. at ¶ 23. Moreover, it is standard procedure for a television production company to conduct a title search for any proposed television show title and it would have taken only a few moments on the internet for the Food Network to discover that the name it was considering for its new show (and a multi-million dollar investment) was in use by Private Chefs. All the information, about Private Chefs, its name and business and mark was and is publically available to The Food Network. Thus, either the Food Network actually knew of "Private Chefs" or, if not, it should have. *See Brookfield*, 174 F.3d at 1059 (noting that "actual or constructive" knowledge of a prior use of a mark is evidence of intent); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 111 (9th Cir. 2000) (finding that a "reasonable investigation into existing uses of the name" of a product is evidence of innocent intent). The Food Network was, at best, reckless in presumably failing to even check public records.

### 7. Summary of *Sleekcraft* Analysis

The most important of the *Sleekcraft* factors are the strength of the marks, the similarities between the marks, and the evidence of actual confusion, "context is critical to a distinctive analysis ...[and the level of distinctiveness of a mark] can be determined only by reference to the goods or services that [the mark] identifies. *Lahoti v. VeriCheck*, 586 F.3rd 1190, 1201 (9th Cir. 2009). Here, all of the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

*Sleekcraft* factors support a finding that Plaintiff will succeed on the merits of its trademark infringement claim, justifying the grant of an injunction.

**B.   Irreparable Harm is Presumed When Confusion is Likely, and the Evidence Shows The Presumption To Be Warranted In This Case**

The court may presume irreparable injury where a plaintiff shows a likelihood of success on the merits of its trademark infringement claim. *Brookfield*, 174 F.3d at 1066; *Vision Sports*, 888 F.2d at 612 n.3 ("[in] unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted"). That presumption is highly warranted in this case. The harm arising from reverse confusion is not likely to be tangible; it is instead the senior user's loss of the "value of [its] trademark, its product identity, corporate identify, control over its goodwill and reputation, and ability to move into new markets. *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 964, 964 (6th Cir. 1987); *Atrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006) (quoting *Ameritech*). Private Chefs has suffered each of these harms, and will continue to do so if a TRO and OSC is not granted.

**C.   The Balance of Equities Tip In Plaintiff's Favor And An Temporary Restraining Order and OSC Is In The Public Interest**

To the extent that the public has any interest in the outcome of this case, it is in permitting businesses and business owners who have invested in branding their products from losing control over their brands. In that sense, the public interest favors Private Chefs. *See Brookfield*, 174 F.3d at 1066 (noting "public interest in protecting trademarks generally"). Moreover, there is a public interest in avoiding consumer confusion.

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

## IV. CONCLUSION

There is one "Private Chefs of Beverly Hills" – it is the Plaintiff's company, which developed substantial public recognition and goodwill in its trademark since Plaintiff's inception in 1995. Defendants are doing more than riding Plaintiff's coattails – they have stolen the coat right off Plaintiff's back by hijacking Plaintiff's federally registered trademark for their Show (a show that itself was stolen from Plaintiff). Defendants should be stopped from further deceiving the public about the source, origin and/or sponsorship of the Show. Because the standards for granting a temporary restraining order and order to show cause re: TRO/Preliminary Injunction are satisfied in the present case, Plaintiff respectfully requests this Court enter the TRO and OSC re: Preliminary Inunction against defendants' use of the mark.

DATED: September 22, 2010

LAW OFFICES OF JONATHAN MARK LEVITAN

and

LATHROP & GAGE LLP

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC: RE PRELIMINARY INJUNCTION

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 12400 Wilshire Boulevard, Suite 1300 Los Angeles, California 90025.

On September 22, 2010 I served the foregoing document described as

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

Kristin L. Holland, Esq
Melissa S. Glousman, Esq
Katten Muchin Rosenman
2029 Century Park East, Suite 2600
Los Angeles, CA 90067

BY PERSONAL SERVICE:

I caused such documents to be delivered such envelope by hand to the office of the addressee.

I am a member of the bar of this court

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 22, 2010 at Los Angeles, California.

Jonathan M. Levitan