Kristin L. Holland (SBN 187314)
Melissa S. Glousman (SBN 252395)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone:   310.788.4400
Facsimile:    310.788.4471
kristin.holland@kattenlaw.com
melissa.glousman@kattenlaw.com

Floyd A. Mandell (*pro hac vice* pending)
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone:   312.902.5200
Facsimile:    312.902.1061
floyd.mandell@kattenlaw.com

Attorneys for Defendants
Food Network, Inc., Scripps Networks, LLC,
Scripps Networks Interactive, Inc. and Target Entertainment Group

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION (Los Angeles)

| | |
|---|---|
| PRIVATE CHEFS, INC.,<br><br>          Plaintiff,<br><br>     vs.<br><br>FOOD NETWORK, INC., A BUSINESS ENTITY TYPE UNKNOWN; SCRIPPS NETWORKS, LLC, A DELAWARE LIMITED LIABILITY COMPANY; SCRIPPS NETWORKS INTERACTIVE, INC. A BUSINESS ENTITY, TYPE UNKNOWN; TARGET ENTERTAINMENT GROUP; and DOES 1 through 10, inclusive,<br><br>          Defendants. | CASE NO. 2:10-cv-06159-CBM (SSx)<br><br>**DEFENDANTS FOOD NETWORK, INC., SCRIPPS NETWORKS, LLC, SCRIPPS NETWORKS INTERACTIVE, INC. AND TARGET ENTERTAINMENT GROUP'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................8

II.   FACTUAL BACKGROUND ..........................................10

     A.    Defendants' Show .............................................10

     B.    Plaintiff's Business...........................................10

     C.    The Parties' Past Dealings ................................10

III.   PLAINTIFF HAS FAILED TO DEMONSTRATE THAT IT IS ENTITLED TO A PRELIMINARY INJUNCTION .........................................12

     A.    Plaintiff Is Unlikely To Succeed On The Merits ....................................13

         1.    The First Amendment Provides An Absolute Defense To Plaintiff's Trademark-Related Claims ............................................14

             a.    Defendants' use of the phrase "private chefs" in the Show's title has artistic relevance ........................16

             b.    Defendants' use of the phrase "private chefs" does not "explicitly mislead" as to the source or content of the Show ................16

         2.    Defendants' Use Of The Phrase "Private Chefs" In The Show's Title Is A Classic Fair Use ............................................20

             a.    Defendants do not use the phrase "private chefs" as a trademark ................20

             b.    Defendants use the phrase "private chefs" in a descriptive manner................21

             c.    Defendants use the phrase "private chefs" in good faith ................21

         3.    The Show's Title Does Not Create A Likelihood Of Confusion ............................................23

             a.    Plaintiff's Mark—PCI PRIVATE CHEFS INC.—is an extraordinarily weak mark ................23

             b.    The marks are dissimilar ................25

             c.    The goods and services are neither proximate nor related ................25

             d.    Defendants selected the Show's name in good faith............26

             e.    The relevant consumers exercise care ................26

             f.    Plaintiff's alleged actual confusion evidence is insufficient ................27

**Katten**
KattenMuchinRosenman llp

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

31538319_343411_00001          2:10-cv-06159-CBM (SSx)

B.     Plaintiff Has Failed To Demonstrate Irreparable Harm............................29

C.     The Balance Of Hardships Weighs In Defendants' Favor .......................31

D.     The Public Interest Factor Is Not Implicated ..........................................32

IV.   BOND.........................................................................................................................32

V.    CONCLUSION .........................................................................................................33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Katten**
KattenMuchinRosenmanLLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

31538319_343411_00001                                                    2:10-cv-06159-CBM (SSx)

Katten

KattenMuchinRosenmanLLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

## TABLE OF AUTHORITIES

**Cases**

*AMF Inc. v. Sleekcraft*,
　599 F.2d 341 (9th Cir. 1979) .................................................. 22, 23, 28

*Applc'n of Cooper*, 254 F.2d 611 (C.C.P.A. 1958) ............................... 18

*Aurora World, Inc. v. Ty Inc.*,
　-- F. Supp. 2d --, 2009 WL 6617192 (C.D. Cal. Dec. 15, 2009) ............ 12, 29, 31

*Bell v. Harley Davidson Motor Co.*,
　539 F. Supp. 2d 1249 (S.D. Cal. 2008) .................................. 20, 21, 22

*Cairns v. Franklin Mint Co.*,
　292 F.3d 1139 (9th Cir. 2002) ............................................ 20, 27

*Dahl v. Swift Distrib.*,
　No. 10-CV-551, 2010 WL 1458957 (C.D. Cal. Apr. 1, 2010) ............. 12, 13, 30

*Dept. of Parks & Rec. v. Bazaar Del Mundo*,
　448 F.3d 1118 (9th Cir. 2006) ................................................. 31

Dessert Beauty, Inc. v. *Fox*,
　568 F. Supp. 2d 416 (S.D.N.Y. 2008) ......................................... 17

*Dreamwerks Prod. Group, Inc. v. SKG Studio*,
　142 F.3d 1127 (9th Cir. 1998) ................................................ 28

*Dymo Indus., Inc. v. Tapeprinter, Inc.*,
　326 F.2d 141 (9th Cir. 1964) ................................................. 12

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc*,
　547 F.3d 1095 (9th Cir. 2008) ............................................ passim

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*,
　444 F. Supp. 2d 1012 (C.D. Cal. 2006) ................................... 14, 19

*Echo Drain v. Newsted*,
　307 F. Supp. 2d 1116 (C.D. Cal. 2003) ................................... 24, 28

*Entrepreneur Media, Inc. v. Smith*,
　279 F.3d 1135 (9th Cir. 2002) ........................................ 23, 24, 27

*Garcoa, Inc. v. PH Beauty Labs, Inc.*,
　2009 WL 2489223 (C.D. Cal. Apr. 10, 2009) ................................. 26

*Hansen Beverage Co. v. Innovation Ventures, LLC*,
　No. 08-cv-1166, 2008 WL 4492644 (S.D. Cal. Sept. 29, 2008) ................ 29

*Herbalife Int'l Inc. v. Lumene North Am. LLC*,
　No. 07-CV-5040, 2007 WL 4225776 (C.D. Cal. Oct. 15, 2007) ................ 21

4

*Instant Media, Inc. v. Microsoft Corp.*,
   No. 07-CV-2639, 2007 WL 2318948 (N.D. Cal. Aug. 13, 2007)......................27

*Int'l Stamp Art, Inc. v. United States Postal Svc.*,
   456 F.3d 1270 (11th Cir. 2006).........................................................................21

*Jockey Club, Inc. v. Jockey Club of Las Vegas, Inc.*,
   595 F.2d 1167 (9th Cir. 1979).........................................................................26

*Kendall-Jackson Winery, Ltd. v. E.&J. Gallo Winery*,
   150 F.3d 1042 (9th Cir. 1998).........................................................................23

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
   543 U.S. 111 (2004) .........................................................................................20

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
   550 F. Supp. 1056 (9th Cir. 1982)...................................................................25

*Los Angeles Mem. Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980).........................................................................31

*M2 Software, Inc. v. Madacy Ent't*,
   421 F.3d 1073 (9th Cir. 2005)....................................................................23, 24

*Mattel Inc. v. MCA Records*,
   296 F.3d 894 (9th Cir. 2002).....................................................................passim

*Mattel Inc. v. Walking Mountain Prods.*,
   353 F.3d 792 (9th Cir. 2003)..............................................................14, 16, 19

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) .........................................................................................12

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   18 F. Supp. 2d 1197 (C.D. Cal. 2007)............................................................29

*Metro-Media Broad. Corp. v. MGM/UA Entertm't Co.*,
   611 F. Supp. 415 (C.D. Cal. 1985)..................................................................30

*Morgan Creek Prod., Inc. v. Capital Cities/ABC, Inc.*,
   No. CV-89-5463-RSWL (JRX), 1991 WL 352619 (C.D. Cal. Oct. 28,
   1991)..................................................................................................................18

*New Kids on the Block v. News Am. Publ'g, Inc.*,
   971 F. 2d 302 (9th Cir. 1992).........................................................................21

*No Fear, Inc. v. Imagine Films, Inc.*,
   930 F. Supp. 1381 (C.D. Cal. 1995)................................................................22

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*,
   762 F.2d 1374 (9th Cir. 1985)....................................................................12, 32

*Official Airline Guides, Inc. v. Goss*,
   6 F.3d 1385 (9th Cir. 1993).............................................................................25

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

5

*One Indus., LLC v. Jim O'Neal Distrib.*,
  578 F.3d 1154 (9th Cir. 2009)....................................................................24

*Packman v. Chicago Tribune Co.*,
  267 F.3d 628 (7th Cir. 2001)...............................................................20, 21

*Planet Coffee Roasters, Inc. v. Hung Dam*,
  No. 09-CV-571, 2010 WL 625343 (C.D. Cal. Feb. 18, 2010)...................13, 31

*Protech Diamond Tools Inc. v. Liao*,
  No. C 08-3684, 2009 WL 1626587 (N.D. Cal. June 8, 2009) ..........................30

*Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp. 2d 1006, 1026 (N.D.
  Cal. 2009) ................................................................................................21

*Red Bull GmbH v. Matador Concepts, Inc.*,
  No. CV 04-9006, 2006 WL 4749923 (C.D. Cal. Jan. 13, 2006)......................22

*Rodeo Collection, Ltd. v. West Seventh*,
  812 F.2d 1215 (9th Cir. 1987).....................................................................29

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d. Cir. 1989) .................................................................passim

*Roxbury Entm't v. Penthouse Media Group Inc.*,
  669 F. Supp. 2d 1170 (C.D. Cal. 2009)........................................................15

*Sardi's Restaurant Corp. v. Sardie*,
  755 F.2d 719 (9th Cir. 1985).......................................................................13

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009)......................................................................13

*Surfvivor Media, Inc. v. Survivor Prod.*,
  406 F.3d 625 (9th Cir. 2004).......................................................................28

*Volkswagen AG v. Verdier Microbus and Camper, Inc.*,
  No. C 09-00231, 2009 WL 928130 (N.D. Cal. April 3, 2009) .........................29

*Winter v. Natural Resources Defense Council, Inc.*,
  129 S. Ct. 365 (2008) ................................................................................13

**Statutes**

15 U.S.C. § 1115(b)(4) ..............................................................................19, 20

15 U.S.C. § 1127 ...........................................................................................20

**Other Authorities**

*McCarthy* § 23:16 (4th ed. 2009) ....................................................................28

McCarthy § 30:45 (4th ed.).............................................................................13

McCarthy § 31:32 (6th ed.).............................................................................30

**Katten**

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**Rules**

Fed. R. Evid. 201 ...................................................................................23

Fed. Rules Civ. Proc. § 65(c) ................................................................32

31538319_343411_00001

2:10-cv-06159-CBM (SSx)

## I.      INTRODUCTION

Defendants did not steal Plaintiff's *Celebrity Dish* concept nor does Defendants' show *Private Chefs of Beverly Hills* (the "Show") infringe any trademark owned by Plaintiff.[1]  Just as Plaintiff does not own a trademark in "Beverly Hills," Plaintiff does not own a federal trademark registration for, or monopoly controlling the use of, the words "private chefs."   In addition, Plaintiff's partner signed an agreement waiving injunctive relief and agreeing to binding arbitration.  Finally, even if these grounds were not already sufficient to deny the application, Plaintiff's unexcused delay of over nine months in seeking this emergency order, on the eve of the *second* season of the Show, belies Plaintiff's claim of irreparable harm and constitutes laches, barring the requested relief.   There is no basis for a temporary restraining order or injunction in this case.

The First Amendment protects Defendants' title and provides a complete defense to Plaintiff's trademark-related claims.  Plaintiff's actual trademark is PCI PRIVATE CHEFS, INC. ("Plaintiff's Mark") which it uses for employment services. Plaintiff's requested relief would impermissibly confer a monopoly for a commonly used descriptive phrase to Plaintiff, effectively prohibiting any use of "private chefs" by anyone else, in the title of any creative audiovisual work.  As will be discussed more fully below, even when this case reaches the appropriate forum, Plaintiff will be unable to succeed on its trademark-related claims because the First Amendment provides a complete defense, Defendants' use of the phrase "private chefs" is a classic fair use under the Lanham Act, and, although not a required analysis in light of Defendants' First Amendment and classic fair use defenses, application of the

---

[1]      A comparison of Plaintiff's 2002 and 2008 Pitch (or "Sizzle") Reels for *Celebrity Dish* to any episode of the Show demonstrates that they are very different in title, focus, content and tone, among many other differences.  On the merits, this case will fail. Indeed, *Celebrity Dish* is so different that Plaintiff relies on hearsay descriptions of the Show rather than on the Show itself.  For the Court's convenience and comparison, Defendants have submitted DVDs of the pilot and first season of the Show with their Opposition.

**Katten**
KattenMuchinRosenmanLLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1    likelihood of confusion factors to the facts of this case reveals that there is no

2    likelihood of confusion between Plaintiff's Mark and the title of the Show.

3         Plaintiff neglects to inform the Court that its partner waived all rights to seek

4    injunctive relief pursuant to a 2008 Submission Release Agreement with Defendant

5    Food Network.[2]   Accordingly, all disputes regarding Plaintiff's "Celebrity Dish"

6    project must be decided in binding arbitration in New York and all injunctive relief,

7    including the instant request for a temporary restraining order enjoining the second

8    season of the Show, is waived.   Plaintiff's omission was intentional, and in spite of

9    warnings from Defendants prior to Plaintiff's filing of its TRO application.   This

10   matter, in its entirety, should be dismissed or stayed, and sanctions may be appropriate

11   for Plaintiff's conduct.

12        Moreover, laches bars the requested relief.   Plaintiff offers no reasonable

13   justification for its nine month delay in bringing the instant emergency application.

14   Granting Plaintiff's belated request for this extraordinary relief would dramatically

15   change the status quo when no new harm to Plaintiff is imminent.   However,

16   enjoining the Show at this late stage would cause extreme hardship to Defendants,

17   who have, since at least December 2009, produced, funded, exhibited and promoted

18   an entire first season of episodes.   The TRO would impermissibly grant Plaintiff all

19   the relief it could hope to receive after prevailing on a full trial on the merits of the

20   case when many facts, including Plaintiff's standing and this Court's jurisdiction, are

21   in dispute.

22        For these reasons, the TRO application should be denied and this case should be

23   stayed pending resolution of Defendants' concurrently filed motion to compel

24   arbitration.   Plaintiff has utterly failed to make a compelling showing of likelihood of

25   success on the merits of its claims.   The requested relief is barred by laches.   As such,

26   Plaintiff's application must be denied.

27

28   [2]      Defendants' Motion to Compel Arbitration has been filed concurrently with this
     Opposition.

Katten

Katten Muchin Rosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

## II.    FACTUAL BACKGROUND

### A.    Defendants' Show

Beginning in December 2009, Food Network, a highly successful cable television network devoting programming to all things food-related, began airing the Show.   *See* Declaration of Jordan Harman ("Harman Decl."), attached hereto as Exhibit A, at ¶¶ 2, 6.   The Show is a form of reality television referred to as a "docusoap[3]," and peeks into the high-demand world of culinary glamour by following six gifted cooks from Big City Chefs—Beverly Hills' premiere private-chef placement agency—as they cater to the whims of their over-the-top and eccentric clientele in Los Angeles' most posh neighborhood.   *See* Harman Decl. at ¶ 4.   The cast includes six chefs with varied culinary expertise and background, and the show has been successful with viewers and critics alike.   *See* Harman Decl. at ¶ 4.

### B.    Plaintiff's Business

Standing in stark contrast to Defendants' Show is Plaintiff's business as a private chef placement agency.   *See* Complaint at ¶ 12.   Specifically, "Plaintiff places private chefs in the homes of many celebrities and persons of substantial wealth."   *Id*.

### C.    The Parties' Past Dealings

On January 14, 2002, Plaintiff and its president, Christian Paier, partnered with Strand Communications ("Strand")—a full service production company—to collaborate and produce a television series entitled *Celebrity Dish*.   *See* Exhibit 8 to Declaration of Christian Paier (D.I. 9-1); Declaration of Christopher Strand ("Strand Decl."), attached hereto as Exhibit B, at ¶¶ 2, 3, 5, 7.   "The premise of 'Celebrity Dish' involved having chefs who worked for celebrities and substantially wealthy persons explaining recipes and the details of how the food was cooked and served, often doing so along side the celebrities for whom they are cooked."   Complaint at ¶ 20.   Plaintiff and Strand entered into a written agreement whereby Strand and Plaintiff would each be executive producers of, and equal revenue partners in, *Celebrity Dish*.

---

[3]   According to FreeDictionary.com, a "docusoap" is defined as "a television documentary series in which the lives of the people filmed are presented as entertainment or drama."

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

1  *See* Exhibit 8 to Declaration of Christian Paier (D.I. 9-1); Strand Decl. at ¶ 5.

2  Pursuant to that partnership, Strand has full authority to make pitches for and act on

3  behalf of Plaintiff with respect to *Celebrity Dish*.  *See* Exhibit 8 to Declaration of

4  Christian Paier (D.I. 9-1); Strand Decl. at ¶ 5.

5  On or around April 3, 2002, Plaintiff's president, Christian Paier, and a

6  representative from Strand met with Food Network representatives to pitch *Celebrity*

7  *Dish*.  *See* Strand Decl. at ¶ 4.  What initially interested Food Network in *Celebrity*

8  *Dish* was the involvement of certain celebrities.  *See* Harman Decl. at ¶ 11.  Shows of

9  this nature featuring "celebrities" and "chefs" are not novel.  *See* Harman Decl. at ¶

10  12.  Indeed, Food Network receives solicitations and/or ideas of this type regularly,

11  and in fact, received numerous such "ideas" both before 2002 and after.[4]  *See* Harman

12  Decl. at ¶ 12.  After this 2002 meeting, Food Network was not interested in *Celebrity*

13  *Dish*.  *See* Strand Decl. at ¶¶ 9, 10.

14  On or around February 7, 2008, Strand again pitched *Celebrity Dish* to the Food

15  Network.  *See* Strand Decl. at ¶ 12; Declaration of Todd Lichten ("Lichten Decl."),

16  attached hereto as Exhibit C, at ¶ 3.  Prior to this pitch, Strand informed Plaintiff's

17  president, Christian Paier, that Strand wanted to renew pitching *Celebrity Dish*, and

18  asked Mr. Paier to confirm that he still wanted to be involved in the project.  *See*

19  Strand Decl. at ¶ 13.  Mr. Paier confirmed that he was still interested in working with

20  Strand on *Celebrity Dish*.  *See* Strand Decl. at ¶ 13.

21  In connection with the 2008 pitch of *Celebrity Dish*, and as a condition of

22  discussing the idea further, Todd Lichten of Strand signed a Submission Release

23  Agreement (attached as Exhibit A to the Lichten Declaration).  *See* Strand Decl. at ¶¶

24  14, 15; Lichten Decl. at ¶ 4.  Mr. Lichten was fully and duly authorized to sign the

25  Submission Release Agreement on behalf of Strand, its partners and the entities it

26  represents, including Plaintiff.  *See* Strand Decl. at ¶ 15; Lichten Decl. at ¶ 5.  In

27
28
---
[4]  Indeed, a series of TV specials entitled *TV Guide Celebrity Dish* aired in 2000, and featured television and movie celebrities cooking their favorite foods.  *See* Harman Decl. at ¶ 12.

11

relevant part, the Submission Release Agreement acknowledged that Strand and Plaintiff  waived its "right to seek remedies in court[5], including the right to a jury trial" and also "waive[d] any right to any other form of relief [from monetary damages], including but not limited to injunctive relief. . . ." *See* Lichten Decl. at ¶ 4 (referring to Exhibit A at ¶¶ 9.C and 9.D).  Such releases are a matter of company policy for all ideas presented to Defendants, and Defendants would not have ever considered such pitch but for Plaintiff's agent Strand signing such release.  *See* Harman Decl. at ¶ 13.  During the February 2008 meeting, Food Network told Mr. Lichten that it was not interested in *Celebrity Dish*.  *See* Lichten Decl. at ¶ 9.

## III.   PLAINTIFF HAS FAILED TO DEMONSTRATE THAT IT IS ENTITLED TO A PRELIMINARY INJUNCTION

"An application for a temporary restraining order involves the invocation of a drastic remedy which a court of equity ordinarily does not grant, unless a very strong showing is made of a necessity and desirability of such action." *Dahl v. Swift Distrib.*, No. 10-CV-551, 2010 WL 1458957, at *2 (C.D. Cal. Apr. 1, 2010) (denying plaintiff's application for temporary restraining order).  Similarly, a preliminary injunction is also an extraordinary and drastic remedy that should only be granted in limited circumstances.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion."); *Aurora World, Inc. v. Ty Inc.*, -- F. Supp. 2d --, 2009 WL 6617192, at *3 (C.D. Cal. Dec. 15, 2009) ("A preliminary injunction is an extraordinary and drastic remedy." (internal citations omitted)).  The basic function of a preliminary injunction is to preserve the status quo *ante litem* pending a determination of the action on the merits.  *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (internal citations omitted).  Thus, where no new harm is imminent, and where no compelling reason is apparent, a

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

---

[5]  As such, Defendants have filed a Motion to Compel Arbitration.  *See* D.I. [insert]

request for such extraordinary relief should be denied. *Id.* Indeed, such relief should be granted only when the movant "*by a clear showing*, carries the burden of persuasion." *Mazurek*, 520 U.S. at 972 (internal citations omitted); *see also Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (explaining that the "grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except a case clearly warranting it.").

"The standard for granting a TRO is identical to the standard for issuing a preliminary injunction." *Dahl*, 2010 WL 1458957, at *2 (internal citations omitted). Therefore, Plaintiff was required to show that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126-27 (9th Cir. 2009) (noting that "[t]o the extent that our cases have suggested a lesser standard [than the one established in *Winter*], they are no longer controlling, or even viable."). Because Plaintiff has failed to prove any of these factors, its request for a preliminary injunction must be denied.

## A. Plaintiff Is Unlikely To Succeed On The Merits

In deciding whether to grant a preliminary injunction, a district court must consider whether the plaintiffs have demonstrated that they are likely to prevail on the merits. *See Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719 (9th Cir. 1985) (affirming the district court's refusal to issue a preliminary injunction in favor of owner of Sardi's restaurant in New York City against use of the name Sardie's by a restaurant owner in Burbank). "'Probability of success' implies that the moving party must have a very clear and strong case." *Planet Coffee Roasters, Inc. v. Hung Dam*, No. 09-CV-571, 2010 WL 625343, at *2 (C.D. Cal. Feb. 18, 2010) (denying plaintiff's motion for preliminary injunction (quoting McCarthy § 30:45 (4th ed.))).

1   "If there is doubt as to the probability of plaintiff's ultimate success on the merits, the

2   preliminary injunction must be denied."  *Id.*

3       Here, Plaintiff's case is anything but "very clear and strong" because

4   Defendants' use of the title *Private Chefs of Beverly Hills* for an artistic work of

5   expression, namely their Show, is fully protected under both the First Amendment and

6   the Lanham Act.  Further, an application of the traditional likelihood of confusion

7   factors to the facts of this case (although not required) reveals that, on balance, there is

8   no likelihood of confusion between Plaintiff's Mark and the title of Defendants'

9   Show.

10       ### 1.   The First Amendment Provides An Absolute Defense To

11       ### Plaintiff's Trademark-Related Claims

12       The title of Defendants' Show, *Private Chefs of Beverly Hills*, is protected

13   expression under the First Amendment of the United States Constitution, providing

14   Defendants an absolute defense against Plaintiff's trademark-related claims.  Indeed,

15   where an allegedly infringing[6] term or phrase—here, "private chefs"—is embodied in

16   a work of artistic expression, federal courts, including those in the Ninth Circuit and

17   the Central District, have found in favor of defendants that such use is protected by the

18   First Amendment and therefore immune from Lanham Act and related state law

19   claims.  *See, e.g., E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 444 F.

20   Supp. 2d 1012 (C.D. Cal. 2006) ("*Rock Star I*"), aff'd, *E.S.S. Entertainment 2000,*

21   *Inc. v. Rock Star Videos, Inc*, 547 F.3d 1095, 1101 (9th Cir. 2008) ("*Rock Star II*")

22   (affirming summary judgment dismissing Lanham Act claims where defendant's use

23   of the name "Pig Pen" in its video game to depict a virtual, cartoon-style strip club

24   with a similar look and feel to plaintiff's real-life strip club operating under the name

25   "Play Pen Gentlemen's Club" was protected artistic expression under the First

26   Amendment); *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir.

27

28   [6]  Defendants do not use Plaintiff's Mark (PCI PRIVATE CHEFS, INC.) in the title of the
Show.  Instead, they use the merely descriptive phrase "private chefs," over which Plaintiff
does not, and cannot, have a monopoly.

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

2003) (affirming summary judgment dismissing trademark claims on First Amendment grounds where defendant's use of the name "Barbie" in the titles of his photographs and on his website accurately described the subject of the photographs he took of the toy doll of the same name manufactured by plaintiff); *Mattel Inc. v. MCA Records*, 296 F.3d 894, 902 (9th Cir. 2002) (affirming summary judgment dismissing trademark claims where defendant's use of the name "Barbie" in the title and lyrics of a song about a toy doll of the same name manufactured by plaintiff was protected artistic expression under the First Amendment); *Roxbury Entm't v. Penthouse Media Group Inc.*, 669 F. Supp. 2d 1170, 1176 (C.D. Cal. 2009) (granting summary judgment to defendant creator of adult film *Route 66* against owner of trademark from 1960's television show *Route 66*, as film was an expressive work, and the First Amendment provided a complete defense to plaintiff's Lanham Act claims).

The test for First Amendment protection of the use of third party trademarks in works of artistic expression is commonly referred to as "the *Rogers* test," as it was first set forth by the Second Circuit in the case of *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d. Cir. 1989). While courts over the years have applied slightly different variations of the *Rogers* test, the most recent pronouncement on the issue in the Ninth Circuit was in *Rock Star II*, in which the court stated: "The specific test contains two prongs. An artistic work's use of a trademark that otherwise would violate the Lanham Act is not actionable 'unless the [use of the mark] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [it] explicitly misleads as to the source or the content of the work.'" *Rock Star II*, 547 F.3d at 1099 (quoting *MCA Records*, 296 F.3d at 902 (quoting *Rogers*, 875 F.2d at 999)); *see also Roxbury Entm't.*, 669 F. Supp. 2d at 1175. As set forth more fully herein, Defendants' use of the title *Private Chefs of Beverly Hills* satisfies both prongs of the *Rogers* test, rendering Plaintiff unable to succeed on the merits of its trademark-related claims.

### a.    Defendants' use of the phrase "private chefs" in the Show's title has artistic relevance

The Ninth Circuit has acknowledged that "[the *Rogers*] test traditionally applies to uses of a trademark in the title of an artistic work." *Rock Star II*, 547 F.3d at 1099. Under *MCA Records* and the cases that followed it, only the use of a trademark with "'no artistic relevance to the underlying work whatsoever'" does not merit First Amendment protection. . . . In other words, the level of relevance merely must be above zero." *Id.* ("It is true that the [defendant's] Game is not "about" the Play Pen the way that Barbie Girl was about Barbie. But, given the low threshold the Game must surmount, that fact is hardly dispositive.").

Defendants qualify for First Amendment protection under the first prong of the *Rogers* test because Defendants' use of the title *Private Chefs of Beverly Hills* has artistic relevance to the underlying work, as it describes the storyline of the Show. Specifically, the Show is about private chefs in Beverly Hills. Thus, one could not imagine a more appropriate or relevant title for the Show.

### b.    Defendants' use of the phrase "private chefs" does not "explicitly mislead" as to the source or content of the Show

With respect to the second prong of the *Rogers* test, the Ninth Circuit stated that:

> This prong of the test points directly at the purpose of trademark law, namely to "avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." ... The relevant question, therefore, is whether the [defendant's] [g]ame would confuse its players into thinking that [plaintiff] is somehow behind [defendant's use of the

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

16

mark] or that it sponsors [defendant's] product. In answering

that question, we keep in mind our observation in *MCA*

*Records* that the mere use of a trademark alone cannot

suffice to make such use explicitly misleading.[7] *Rock Star*

*II*, 547 F.3d at 1100 (quoting *Walking Mountain*, 353 F.3d at

806, and *MCA Records*, 296 F.3d at 902).

In this case, Defendants' use of the phrase "private chefs" in the title of the Show is not explicitly misleading as to the source or origin of the Show.  First, marketing of the Show prominently alerts viewers, actual and potential, in multiple ways that the Food Network, a popular and well known television network and brand, is the source of the Show.  The advertising for the Show is predominately placed on the Food Network station and website.  *See* Harman Decl. at ¶ 7.  Further, the Show airs exclusively on the Food Network.  *See* Harman Decl. at ¶ 7.  Also, in the opening credits, a gate emblazoned with the Food Network logo opens to begin the Show.  *See* Harman Decl. at ¶ 8.  Then, at all times during the Show, the circular Food Network logo is present in the lower left hand corner of viewers' television screens.  *See* Harman Decl. at ¶ 8.  In addition, advertising for other Food Network shows, such as *The Next Food Network Star*, pops up during the Show in the bottom portions of viewers' television screens.  *See* Harman Decl. at ¶ 8.  Indeed, the ubiquitous presence of the Food Network mark in connection with the Show further ensures that Defendants' use of the phrase "private chefs" is not deemed to serve any trademark function.  *See, e.g., Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 424 (S.D.N.Y. 2008) ("Words on a product's packaging generally do not serve as a trademark where there is also a conspicuously visible trademark that clearly serves that function.")  Furthermore, the name of the chef placement agency featured in the Show, Big City

---

[7]  Previously, in *MCA Records*, the Ninth Circuit explained that the defendant's use of the plaintiff's "Barbie" trademark in the title of defendant's song had no independent legal significance since "[t]he only indication that [plaintiff] might be associated with the [defendant's] song is the use of Barbie in the title; if this were enough to satisfy this [second] prong of the Rogers test, it would render Rogers a nullity." *MCA Records*, 296 F.3d at 902.

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Chefs, is displayed and featured throughout the Show and on Defendants' website. *See* Harman Decl. at ¶ 9.  Indeed, the chefs wear uniforms emblazoned with the Big City Chefs logo, and members of the staff and their clients repeatedly mention "Big City Chefs."  *See* Harman Decl. at ¶ 9.  When management, such as Tom Stieber, the CEO, and Samantha Martz, the general manager, speak to the camera, on-screen text indicates their titles and their affiliation with Big City Chefs.  *See* Harman Decl. at ¶ 9.  Thus, the Show's prominent use of the Food Network mark and repeated references to the Big City Chefs employment agency satisfy the second requirement of the *Rogers* test by ensuring that Defendants' use of the term "private chefs" does not "explicitly mislead" consumers as to the source or sponsorship of the Show.

Further, Defendants' use of "private chefs" in the title of the Show does not, and, indeed, cannot, serve as a trademark.  A title of a single artistic work does not function as a source identifier.  *See, e.g., Morgan Creek Prod., Inc. v. Capital Cities/ABC, Inc.*, No. CV-89-5463-RSWL (JRX), 1991 WL 352619, *2 (C.D. Cal. Oct. 28, 1991) (explaining that a film's title cannot "be a trademark unless it has acquired secondary meaning"); *Applc'n of Cooper*, 254 F.2d 611, 615-16 (C.C.P.A. 1958) (A "title… identifies a specific literary work… and is not associated in the public mind with the… manufacturer.") (internal quotation marks omitted).

Moreover, as the Ninth Circuit stated in *MCA Records*, "[c]onsumers expect a title to communicate a message about the book or movie, but they do not expect it to identify the publisher or producer."  *MCA Records*, 296 F.3d at 902 (holding that defendant was entitled to summary judgment).  Thus, viewers tune in to the Show expecting a reality program about private chefs in Beverly Hills; they are not expecting a show about Plaintiff's placement agency, Private Chefs Inc.

Finally, there is no evidence that consumers have been, or will be, misled as between the nature and content of the goods and services provided by the respective parties.  As the court in *Rock Star II* stated about the parties before it – one a strip club

operator and the other a maker of a video game that included a depiction of a strip club by a similar name:

> Both [parties] offer a form of low-brow entertainment; besides this general similarity, they have nothing in common. . . . [V]ideo games and strip clubs do not go together like a horse and carriage . . . . Nothing indicates that the buying public would reasonably have believed that [plaintiff] produced [defendant's] video game or, for that matter, that [defendant] operated a strip club.

*Rock Star II*, 547 F.3d at 1100.

It is not plausible that the Show, a docusoap which serves as entertainment and social commentary on the demanding nature of rich and famous individuals, could be confused with Plaintiff's placement agency, which caters to an elite clientele. However, even where there is a risk that consumers will wrongly presume sponsorship or endorsement, a risk not present under the facts here, the risk may be outweighed by public interest in artistic expression. *See Rogers*, 875 F.2d at 1001 (finding that the First Amendment protected the defendant's title use even though both survey and actual confusion evidence established that the defendant's movie title misled potential movie viewers as to the plaintiff's connection with the film).

When measured against the "explicitly misleading" standard articulated by the Ninth Circuit in *Walking Mountain* and reiterated in *Rock Star II*, it is inconceivable that Defendants' use of the phrase "private chefs" in the title of their Show which airs exclusively on the Food Network, could somehow "'dup[e] consumers into buying a product [i.e., the Show] they mistakenly believe is sponsored by the trademark owner [i.e., Plaintiff].'" *Rock Star II,* 547 F.3d at 1100. This fact, combined with the artistic relevance of the title to the underlying Show, renders the *Private Chefs of Beverly Hills* title fully protected speech under the First Amendment, thereby providing an absolute defense to Plaintiff's trademark-related claims.

19

Katten

Katten Muchin Rosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**2.      Defendants' Use Of The Phrase "Private Chefs" In The Show's Title Is A Classic Fair Use**

Because the title of Defendants' Show is protected under the First Amendment, "it falls outside the proscriptions of the Lanham Act." *Rock Star I*, 444 F. Supp. 2d at 1049. However, even if Defendants' use of the phrase "private chefs" were to be analyzed within the confines of the Lanham Act, Plaintiff is unlikely to succeed on the merits of its trademark-related claims on the ground that Defendants' use of that phrase is a "classic" fair use authorized by the statute itself. *See* 15 U.S.C. § 1115(b)(4). Indeed, where a junior user: "(1) is not using the term as a trademark, (2) uses the term only to describe its goods and services, and (3) uses the term fairly and in good faith," such use is permitted and infringement cannot be found. *Bell v. Harley Davidson Motor Co.*, 539 F. Supp. 2d 1249, 1257 (S.D. Cal. 2008) (*quoting Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150-1151 (9th Cir. 2002)); *see also* 15 U.S.C. § 1115(b)(4) (setting forth the statutory basis for the classic fair use defense and articulating the same essential elements). In addition, although Plaintiff is unable to establish a likelihood of confusion (*see* Sec. III.3, *infra*), the fair use defense may prevail even where there is a likelihood of confusion, though the court may consider the degree of any such confusion in ruling on the fair use defense. *See Bell*, 539 F. Supp. 2d at 1257 (citing *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 124 (2004)); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001) (noting, in finding fair use, that the newspaper's "joy of six" t-shirt "plainly indicat[ed] the Tribune as the source").

**a.      Defendants do not use the phrase "private chefs" as a trademark**

The Lanham Act defines a trademark as "any word, name, symbol, or device, or a combination thereof used by a person. . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. This definition also

1    accurately describes common law trademark use.  As previously discussed, *supra*, at

2    Sec. III.b, Defendants' use of the phrase "private chefs" in the title of the Show does

3    not function as a source identifier and thus is not a trademark use.

### b.    Defendants use the phrase "private chefs" in a descriptive manner

6    Defendants readily satisfy this element because the title of the Show uses the

7    phrase "private chefs" only in a descriptive sense—namely, to describe the content of

8    their television show about private chefs employed in Beverly Hills, California.

9    "[T]he crux of the fair use doctrine is to 'forbid a trademark registrant to appropriate a

10   descriptive term for his exclusive use and so prevent others from accurately describing

11   a characteristic of their goods'." *Bell*, 539 F. Supp. 2d at 1259 *citing New Kids on the*

12   *Block v. News Am. Publ'g, Inc.*, 971 F. 2d 302, 306 (9th Cir. 1992); s*ee also Packman*,

13   267 F.3d at 641 (plaintiff "cannot appropriate the phrase to herself and thereby

14   prevent others from using the phrase in a descriptive sense, as defendants did here.").

15   As in *Bell* and *Packman*, Plaintiff should not be permitted to "hold the phrase hostage

16   against" Defendants' right to invoke the public domain significance of the phrase

17   "private chefs" in describing the Show.  It would undermine the principle of fair use,

18   and the First Amendment from which it is derived, to permit Plaintiff to monopolize

19   this descriptive term.

### c.    Defendants use the phrase "private chefs" in good faith

21   In the Ninth Circuit, "'the standard for good faith for fair use . . . asks whether

22   the alleged infringer intended to trade on the good will of the trademark owner by

23   creating confusion as to the source of the goods or services.'" Bell, 539 F. Supp. 2d at

24   1258 (quoting *Int'l Stamp Art, Inc. v. United States Postal Svc.*, 456 F.3d 1270, 1274-

25   75 (11th Cir. 2006) (citing cases from five other circuits, including the Ninth

26   Circuit))).  In adopting and using the phrase "private chefs," Defendants have only

27   acted in good faith.  Defendants' intention in using this phrase in the title of the Show

28   was to precisely describe to viewers the subject matter of the show—private chefs

**Katten**
KattenMuchinRosenmanLLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

21

working in Beverly Hills.  In so doing, Defendants did not act with any intent to cause consumer confusion with Plaintiff's placement agency, nor has Plaintiff offered any evidence to the contrary.  *See Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp. 2d 1006, 1026 (N.D. Cal. 2009) (stating that "[a]n allegation of bad faith alone, without supporting evidence, is insufficient to create a question of material fact."). Further, Defendants' continued use of the descriptive phrase after receipt of Plaintiff's cease and desist letter also does not constitute bad faith.  *See Herbalife Int'l Inc. v. Lumene North Am. LLC*, No. 07-CV-5040, 2007 WL 4225776, at *12 (C.D. Cal. Oct. 15, 2007) (refusing to presume willful intent where defendant opted to defend against claims of trademark infringement and unfair competition rather than to cease and desist, and stating that such action by defendant "is not facially illegitimate" since "[a]ll indications are that [defendant] has a good faith belief that its use of [the complained-of mark] is not infringing."); *Red Bull GmbH v. Matador Concepts, Inc.*, No. CV 04-9006, 2006 WL 4749923 (C.D. Cal. Jan. 13, 2006) (finding "no evidence in the record of any 'mal-intent' on the part of [defendant]" notwithstanding, among other things, defendant's continued use of the complained-of design on its product despite receiving two cease-and-desist letters from plaintiffs).

The fact that the show ran a full season without <u>any</u> Complaint from Plaintiff illustrates that continued use of the title into the <u>second</u> season is not bad faith use.

Thus, Defendants' classic fair use of the phrase "private chefs" provides another defense to Plaintiff's trademark-related claims, and yet another reason why Plaintiff is unlikely to succeed on the merits of its case.

Katten

KattenMuchinRosenmanLLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

### 3.    The Show's Title Does Not Create A Likelihood Of Confusion

Under both the First Amendment[8] and classic fair use[9] defenses, the Court is arguably not required to engage in any likelihood of confusion analysis.  As such, an application of the likelihood of confusion factors articulated by the Ninth Circuit in the case of *AMF Inc. v. Sleekcraft*, 599 F.2d 341 (9th Cir. 1979)—(1) the strength of the mark; (2) proximity of the goods and services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of care likely to be exercised by purchasers; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion—to the facts of this case is unnecessary in evaluating Plaintiff's likelihood of success on the merits.  However, to the extent that this Court determines that, as part of, or instead of, the "explicitly misleading" standard articulated in *Rogers*, or in connection with its classic fair use analysis, it should apply the traditional "likelihood of confusion" multi-factor test, Plaintiff's motion must still be denied as, on balance, the majority of these factors favor Defendants.  *See e.g. M2 Software, Inc. v. Madacy Ent't*, 421 F.3d 1073 (9th Cir. 2005) (finding no likelihood of confusion where, on balance, the *Sleekcraft* factors favored defendant).

### a.    Plaintiff's Mark—PCI PRIVATE CHEFS INC.—is an extraordinarily weak mark

First, Plaintiff's Mark is extraordinarily weak.  Plaintiff characterizes its Mark as suggestive, and therefore worthy of a higher level of protection, because the Mark

---

[8]   The appellate courts in *Rock Star II* and *Rogers* (and others cases following them) reached their respective decisions without analyzing the likelihood of confusion as part of the "explicitly misleading" analysis under the second prong of the test articulated in *Rogers*. Other courts, however, have stated that this prong requires a supplemental determination of whether a likelihood of confusion exists, while yet other courts have dispensed with any analysis of the "explicitly misleading" test under the second prong of *Rogers* in favor of conducting a "likelihood of confusion analysis instead. *See, e.g., No Fear, Inc. v. Imagine Films, Inc.,* 930 F. Supp. 1381, 1382-84 (C.D. Cal. 1995) (observing that courts have applied the rule articulated in *Rogers* by looking to the standard likelihood of confusion factors, but noting that "Plaintiff's showing under *Sleekcraft* must be **particularly compelling** to overcome the constitutional protection afforded expressive activity") (emphasis added).

[9]   *See Bell*, 539 F. Supp. 2d at 1257 ("the defendant has no independent burden to negate the likelihood of any confusion in raising the affirmative defense of fair use" and "some possibility of consumer confusion must be compatible with fair use." (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 US 111, 122 (2004)).

Katten
KattenMuchinRosenmanLLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

2:10-cv-06159-CBM (SSx)

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1  supposedly "alludes" to "providing carefully selective chefs to an exclusive clientele"

2  and "the nature, characteristic and quality of the chefs themselves."  Plaintiff's Mot. at

3  p. 9.  Contrary to Plaintiff's contention, the Mark does not allude to anything; instead

4  it expressly describes the services it offers—private chef services.  Thus, the Mark is,

5  at best, merely descriptive because it describes the qualities or characteristics of the

6  service with which it is used "in a straightforward way that requires no exercise of the

7  imagination to be understood."  *Kendall-Jackson Winery, Ltd. v. E.&J. Gallo Winery,*

8  150 F.3d 1042, 1047 n.8 (9th Cir. 1998).  Descriptive marks such as Plaintiff's are

9  entitled to a limited scope of protection, if at all.[10]  *See Entrepreneur Media, Inc. v.*

10  *Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002).

11      Serving to further weaken any rights Plaintiff may have in the Mark are a

12  multitude of third party uses (of which the Court may take judicial notice (*see* Fed. R.

13  Evid. 201)) that include, without limitation, federal trademark registrations for

14  ASPEN PRIVATE CHEF.COM (Fed. Reg. No. 3629104), YOUR PRIVATE CHEF

15  (Fed. Reg. No. 3491552) and PRIVATE CHEF (Fed. Reg. No. 2891301), and a state

16  trademark registration for A PRIVATE MAUI CHEF (Hawaii Reg No. 4052741).

17  (*See* Declaration of Kristin L. Holland ("Holland Decl."), attached hereto as Exhibit

18  D, at ¶ 2.)  Further, common law uses include "American Personal & Private Chef

19  Institute," "Private Chef Catering Service," "the Private Chef Cookbook," "Private

20  Chef Natural Gourmet," "The Big Island Private Chefs" and "Witchita Private Chefs."

21  (*See* Holland Decl. at ¶ 3.)  In addition, a basic Google search of private chefs results

22  in hundreds of thousands of results and exemplifies the fact that the phrase "private

23  chefs" describes exactly that—private chefs.  (*See* Holland Decl. at ¶ 4); *see also*

24  *Entrepreneur Media,* 279 F.3d at 1143-44 ("[T]he the marketplace is replete with

25  products using a particular trademarked word indicates . . . the likelihood that

26  consumers will not be confused by its use.  The fact that the term... resides in the

27  ─────────────────────
[10]   Indeed, Plaintiff's Mark is the subject of a pending cancellation proceeding in the
28  Trademark Trial and Appeal Board on grounds that include the fact that Plaintiff's Mark has
not acquired the distinctiveness or secondary meaning required for continued registration of
such a descriptive mark.  *See* Holland Decl. at ¶ 5.

1    public domain lessens the possibility that a purchaser would be confused and think the

2    mark came from a particular single source.); *One Indus., LLC v. Jim O'Neal Distrib.*,

3    578 F.3d 1154, 1164 (9th Cir. 2009) ("When similar marks permeate the marketplace,

4    the strength of the mark decreases.  In a crowded field of similar marks, each member

5    of the crowd is relatively weak in its ability to prevent use by others in the crowd."

6    (internal quotation marks omitted)); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116,

7    1124 (C.D. Cal. 2003).  This factor favors Defendants.

### b.      The marks are dissimilar

9        Next, although Plaintiff falsely claims ownership of a federally registered

10   trademark for PRIVATE CHEFS (*see* Complaint at ¶ 2 and Plaintiff's Mot. at p. 4), in

11   fact, Plaintiff's Mark is for PCI PRIVATE CHEFS, INC. and design.  *See* Exhibit A

12   to Complaint.  "[T]he trademark is not judged by an examination of its parts, but

13   rather 'the validity and distinctiveness of a composite trademark is determined by

14   viewing the trademark as a whole, as it appears in the marketplace.'"  *M2 Software,*

15   *Inc.*, 421 F.3d at 1082 (quoting *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385,

16   1392 (9th Cir. 1993)).  Quite simply, the title *Private Chefs of Beverly Hills* and

17   Plaintiff's Mark, PCI PRIVATE CHEFS, INC., do not sound alike, nor do they look

18   alike.  In addition, Plaintiff's attempt to introduce the iconic City of Beverly Hills sign

19   into the analysis is disingenuous and irrelevant.  *See* Plaintiff's Mot. at p. 11.  This

20   sign does not form any part of Plaintiff's Mark, Plaintiff has no rights to it as it is part

21   of the public domain, and Plaintiff holds no rights in the name "Beverly Hills."  This

22   factor favors Defendants.

### c.      The goods and services are neither proximate nor related

24       Next, the parties' respective goods and services are neither proximate nor

25   related, but instead are clearly distinctive.  Plaintiff's statement that "[t]he services are

26   highly related because they are identical and the consuming public believes them to be

27   related" is of questionable logic and without any support.  Plaintiff's Mot. at p. 11.

28   Plaintiff's service is a *private chef placement agency* that caters to a small, elite group

Katten
Katten Muchin Rosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

25

of clientele who are discerning in their buying decision.  Defendants' good is a *television show* about private chefs catering to their over-the-top clientele.  Clearly, an employment agency and a television show are not "identical," nor are they even related, and there is no evidence that consumers in the marketplace view them as such.  This factor also favors Defendants.

### d.   Defendants selected the Show's name in good faith

The phrase "private chefs" is not one invented by Plaintiff, and Defendants' intent in adopting the *Private Chefs of Beverly Hills* title was simply to describe the content of its reality television program to viewers.  *See* Harman Decl. at ¶ 5.  Defendants in no way adopted the title to cause consumer confusion with Plaintiff's placement agency, or to "cash-in" on Plaintiff's Mark, and Plaintiff has not offered any evidence to the contrary.  *See* Harman Decl. at ¶ 5; *see also Lindy Pen Co., Inc. v. Bic Pen Corp*, 550 F. Supp. 1056 (9th Cir. 1982) (more than simple knowledge of prior use is needed to show intent to misappropriate goodwill where plaintiff chooses highly descriptive mark and defendant merely chooses descriptive word to identify its product); *Jockey Club, Inc. v. Jockey Club of Las Vegas, Inc.,¸* 595 F.2d 1167 (9th Cir. 1979) (affirming judgment that notwithstanding that defendants knew that plaintiffs were using the "Jockey Club" name, there could be no bad faith finding absent evidence that defendants knew nature of plaintiffs' Miami facility or were trying to exploit plaintiffs' good will).  Further, Defendants' good faith intent *not* to create consumer confusion is evidenced by the use of the Food Network house mark in connection with the branding and marketing of *Private Chefs of Beverly Hills*, including on the Show's webpage and in other promotional materials.  *See* Sec. III.1.b, *supra*.  This factor also favors Defendants.

### e.   The relevant consumers exercise care

The degree of care likely to be exercised by consumers also favors Defendants.  The services offered under Plaintiff's Mark are directed to sophisticated consumers—"Plaintiff places private chefs in the homes of many celebrities and persons of

26

substantial wealth" and "Plaintiff's reputation for provided [sic] elite chef services is unmatched and is a result of many years of providing the services that its demanding clients pay for and expect."  Complaint at ¶ 12.  "The ordinary purchaser is assumed to take more care in purchasing "expensive" items which he or she buys infrequently, than in buying everyday, relatively inexpensive items."  *Garcoa, Inc. v. PH Beauty Labs, Inc.*, 2009 WL 2489223 at *8 (C.D. Cal. Apr. 10, 2009).  Given the degree of sophistication of Plaintiff's consumers, and the care exercised in their purchasing decisions, consumers are not likely to be confused as to the source or origin of Defendants' Show.  Further, despite having the burden to do so, Plaintiff has failed to establish that viewers of the Show are unlikely to exercise care in their viewing preferences, such that they would be confused as to the source of sponsorship of the Show.  Because the Food Network is an established network with viewers consisting of those interested in culinary shows, this factor also weighs in Defendants' favor. *See* Harman Decl. at ¶ 2.

## f.    Plaintiff's alleged actual confusion evidence is insufficient

Finally, "[t]o constitute trademark infringement, use of a mark must be likely to confuse an appreciable number of people as to the source of the product." *Entrepreneur Media*, 279 F.3d at 1151.  A persuasive way of demonstrating actual confusion in the marketplace is by means of survey evidence.  Here, Plaintiff had ample time to commission such a survey—the Show began airing in December 2009 and completed its first season on May 14, 2010, Plaintiff sent a cease and desist letter to Defendants on July 16, 2010, and filed its Complaint on August 17, 2010—over a month before it filed its motion for a TRO and preliminary injunction.  *See* Harman Decl. at ¶ 6; Plaintiff's Motion (D.I. 9 at p. 6); Complaint (D.I. 1 at ¶ 35).  Despite this substantial time period, Plaintiff has offered no such survey.  And, although not fatal, the "failure to conduct a consumer survey [before seeking injunctive relief] . . . may lead to an inference that the results of such survey would be unfavorable" and

"undermine [a plaintiff's] position that [the marks at issue] are likely to confuse consumers." *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041-42 (C.D. Cal. 1998).

Lacking any such survey, Plaintiff proffers a handful of declarations from certain of its employees that recite vague, fleeting and self-serving assertions of confusion allegedly experienced by such employees and various clients of Plaintiff, with such episodes of alleged confusion being immediately dispelled. *See* D.I. 9-1 – 9-11. "Relevant confusion is that which affects purchasing decisions, not confusion generally," as "[b]efuddlement is part of the human condition. . . . [n]o matter how clear the markings, no matter how different the names, no matter how distinctive the [products], some confusion is inevitable." *Instant Media, Inc. v. Microsoft Corp.*, No. 07-CV-2639, 2007 WL 2318948, at * 14 (N.D. Cal. Aug. 13, 2007) (denying motion for preliminary injunction (citing *Echo Drain*, 307 F. Supp. 2d at 1126-27 (C.D. Cal. 2003)); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1148 (C.D. Cal. 1998). As such, this biased and hearsay evidence is far too ambiguous to demonstrate actual confusion. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 843 n.7 (9th Cir. 2002) ("[Plaintiff] received several dozen inquiries over the years about whether the parties were related. Without some other evidence of actual confusion, however, these inquiries are too ambiguous to demonstrate actual confusion."); *Surfvivor Media, Inc. v. Survivor Prod.*, 406 F.3d 625, 633 (9th Cir. 2004) (actual confusion factor decided in defendant's favor where there was "scant evidence of actual confusion in the record" limited to one retailer and one individual customer who mistook one of defendant's products as plaintiffs); *Echo Drain*, 307 F. Supp. 2d at 1126-27 (plaintiff's evidence of actual confusion, which consisted of four letters from friends and a few unauthenticated e-mails and postings to its website, was not sufficient evidence of actual confusion); *Instant Media*, 2007 WL 2318948, at *14 (finding declaration of Plaintiff's CEO that Plaintiff received a number of phone calls and website inquiries insufficient hearsay evidence of actual   confusion); J. Thomas

31538319_343411_00001                                                          2:10-cv-06159-CBM (SSx)

1   McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 23:16 (4th ed.

2   2009) (noting that "while enquiry evidence is admissible and relevant, standing alone

3   with no other evidence is insufficient proof of actual confusion.").

4        Further, the assessment of this factor is also subject to the realities of the

5   marketplace.  Where a party chooses a mark that is conceptually weak, the party

6   "should have anticipated some confusion."  *Echo Drain*, 307 F. Supp. 2d at 1124

7   (C.D. Cal. 2003); *see also Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d

8   1127, 1130 (9th Cir. 1998) (noting that "[h]ad Dreamwerks chosen a descriptive mark,

9   like Sci-Fi Conventions Inc., or a suggestive mark like Sci-Fi World, some confusion

10  with legitimate competitors might be expected.").  On balance, this factor also favors

11  Defendants—Plaintiff's so-called actual confusion evidence fails.

12       Thus, although an application of the *Sleekcraft* factors to this case is

13  unnecessary, engaging in such analysis provides yet another reason why Plaintiff is

14  not likely to succeed on the merits of its case, such that its motion must be denied.

15       **B.   Plaintiff Has Failed To Demonstrate Irreparable Harm**

16       In addition to establishing a likelihood of success on the merits of its claims,

17  Plaintiff is also required to demonstrate that it will be irreparably harmed if

18  Defendants are able to continue using the *Private Chefs of Beverly Hills* title for the

19  Show.  In so doing, Plaintiff cannot rely on a presumption of irreparable harm, but

20  instead must make a concrete showing of actual irreparable harm.  *See, e.g., Aurora*

21  *World, Inc.*, -- F. Supp. 2d --, 2009 WL 6617192, at *36-37 (C.D. Cal. Dec. 15, 2009)

22  (denying preliminary injunction motion and explaining that presumption of irreparable

23  harm where likelihood of confusion has been shown is no longer valid); *Volkswagen*

24  *AG v. Verdier Microbus and Camper, Inc.*, No. C 09-00231, 2009 WL 928130, at *6

25  (N.D. Cal. April 3, 2009) (irreparable harm is no longer presumed; trademark

26  plaintiffs must "demonstrate, by . . . admissible evidence . . . that the harm is real,

27  imminent and significant, not just speculative or potential."); *Hansen Beverage Co. v.*

28  *Innovation Ventures, LLC*, No. 08-cv-1166, 2008 WL 4492644, at *4 (S.D. Cal. Sept.

29, 2008) (denying Lanham Act preliminary injunction and concluding that no irreparable harm presumption applies); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1209 (C.D. Cal. 2007) (no presumption of irreparable harm in intellectual property cases, because "the Ninth Circuit has applied *eBay* to the Lanham Act"). Rather than presenting actual evidence of irreparable harm, Plaintiff relies on a no-longer applicable presumption of irreparable harm in trademark infringement cases.[11] That position fails as a matter of law and, since irreparable injury is a required element for any injunction, that failure compels denial of the injunction.

Further, had it been faced with any *real* immediate and irreparable harm and exigent circumstances, Plaintiff could have filed its Complaint and motion for injunctive relief months earlier when *Private Chefs of Beverly Hills* first aired on the Food Network in December 2009. *See* Harman Decl. at ¶ 6. It did not, and instead chose to wait until after the first season had aired in its entirety and preparations were underway for the airing of the second season to begin on the Food Network in October 2010. *See* Harman Decl. at ¶ 10. Further, when Plaintiff ultimately filed its Complaint on August 17, 2010, it could have concurrently filed an *ex parte* application for a temporary restraining order. It did not. Nor did Plaintiff file its motion for a preliminary injunction at or near the time it filed its Complaint. If Plaintiff was able to exist for months without injunctive relief, it seems obvious that swift action by the Court now is unnecessary to prevent any purported irreparable harm. *See Dahl*, 2010 WL 1458957, at *4 (holding that even a mere 17 day delay between the filing of the complaint and the application for a temporary restraining order "implies a lack of urgency and irreparable harm."); *Metro-Media Broad. Corp.*

---

[11] Even if the presumption of irreparable harm is still valid in the Ninth Circuit, which it is not, such a presumption does not apply in the instant case because Plaintiff has failed to demonstrate any likelihood confusion, as discussed, *supra*, at Sec. III.3. *See Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1220 (9th Cir. 1987) (stating the previous standard that once the plaintiff has established a likelihood of confusion, the court will ordinarily presume "that the plaintiff will suffer irreparable harm if the injunctive relief does not issue.")

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1    *v. MGM/UA Entertm't Co.*, 611 F. Supp. 415, 427 (C.D. Cal. 1985) (four month delay

2    in seeking injunctive relief supported denial of plaintiff's motion for preliminary

3    injunction when plaintiff delayed seeking relief regarding television negotiations until

4    the time commitments for the season were imminent); *Protech Diamond Tools Inc. v.*

5    *Liao*, No. C 08-3684, 2009 WL 1626587 (N.D. Cal. June 8, 2009) (plaintiff's delay in

6    filing trademark infringement suit served to undermine plaintiff's claim of immediate,

7    irreparable harm); 6 McCarthy § 31:32 (even a few weeks delay may undercut the

8    purported need for the extraordinary remedy of immediate injunctive relief).

9         Finally, and as explained, *supra*, at Sec. II.C, Plaintiff, through its partner,

10   expressly waived any right to injunctive relief, acknowledging that monetary damages

11   would suffice for any determined improper use or trademark infringement.   Monetary

12   loss alone does not constitute an irreparable injury and Plaintiff cannot now claim that,

13   despite its previous agreement that monetary remedies alone would suffice, it is now

14   irreparably harmed.   *Los Angeles Mem. Coliseum Comm'n v. Nat'l Football League*,

15   634 F.2d 1197, 1202 (9th Cir. 1980) (recognizing that monetary damages, no matter

16   how substantial, are generally not considered irreparable harm); *Aurora World, Inc.*, --

17   F. Supp. 2d --, 2009 WL 6617192, at *3 (recognizing that if the harm to plaintiff is

18   merely monetary, injunctive relief is usually not available).

19        **C.     The Balance Of Hardships Weighs In Defendants' Favor**

20        Also before a preliminary injunction may issue, the Court must consider the

21   degree of harm that will be suffered by Plaintiff or Defendants "if the injunction is

22   *improperly* granted or denied."   *Planet Coffee Roasters*, 2010 WL 625343 at *6

23   (internal citations omitted).   Here the balancing of equities weighs decidedly in

24   Defendants' favor.

25        If the Court wrongly grants the requested injunctive relief, the status quo will be

26   changed as Defendants will be forced to, at minimum, delay the broadcast of the

27   second season of the Show, which would negatively impact viewership and revenues.

28   *See* Harman Decl. at ¶ 10.   Further, such injunctive relief would render worthless

**Katten**
Katten Muchin Rosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

Defendants' significant expenditures in connection with developing, advertising and promoting the second season.  *See* Harman Decl. at ¶ 10.  Defendants have created a goodwill in and audience for their show which will be irreparably lost.

By contrast, Plaintiff faces no hardship if the Court wrongly denies injunctive relief.  Plaintiff survived the entire first season and the status quo will remain in that Plaintiff will continue to engage in its private chef placement business, along with the multitude of other companies operating under similar names.

### D.    The Public Interest Factor Is Not Implicated

The public interest is implicated only when a likelihood of success on the merits is demonstrated.  *See Dept. of Parks & Rec. v. Bazaar Del Mundo*, 448 F.3d 1118, 1124 (9th Cir. 2006).  Because Plaintiff has fallen so far short of making such a showing, its request for an injunction does not invoke the public interest factor.  *See id*.  However, even if the Court were to engage in an analysis of this factor, it favors Defendants.  Indeed, if parties were allowed to sit by and watch as another airs an entire season of a successful television show, or launches a popular product, and then wait even longer, without justification, until additional goodwill and success is established before seeking and obtaining such extraordinary injunctive relief, a mockery would be made of the very purpose of such injunctive relief.  *See Oakland Trib.*, 762 F.2d at 1377 (explaining that the purpose is to preserve the stats quo and that where no new harm is imminent, and where no compelling reason is apparent, a request for such extraordinary relief should be denied).

## IV.    BOND

If, notwithstanding Defendants' foregoing argument and analysis,  the Court decides to issue a TRO, Defendants respectfully request that the Court require Plaintiff to post security under Federal Rule of Civil Procedure 65(c) in an amount according to proof.  Indeed, if Defendants are subjected to a TRO or preliminary injunction, even for a short period of time, they will substantial suffer damages and

1   lost revenues of a significant sum which they will prove and demonstrate should this

2   TRO be granted.  *See* Harman Decl. at ¶ 10.

3   **V.      CONCLUSION**

4          Plaintiff has utterly failed to demonstrate any likelihood of success on the

5   merits.  In addition, it has not shown that it will be irreparably harmed by Defendants'

6   ability to air the second season of *Private Chefs of Beverly Hills* or that the balance of

7   hardships weighs in its favor.  As such, and for the foregoing reasons, Defendants

8   respectfully request that the Court deny Plaintiff's application for a temporary

9   restraining order and motion for a preliminary injunction.

10

11  Dated:  September 26, 2010                KATTEN MUCHIN ROSENMAN LLP

12

13                                           By:   /s/ Kristin L. Holland
                                             Attorneys for Defendants
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28